UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| DONALD QUADE, *ET AL.* | ) | |
| | ) | |
| v. | ) | NO. 2:07-CV-64 |
| | ) | |
| PEDRO G. RODRIGUEZ, *ET AL.* | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs have brought this civil action, arising out of a fatal automobile

collision, against Pedro Rodriguez ("Rodriguez"), a foreign nation who is a citizen of

Mexico, Maynard Johnson ("Johnson"), Robert Dunbar ("Dunbar") and Ken Horton

("Horton"), all citizens and residents of Greene County, Tennessee, and Ken's Motors,

a sole proprietorship owned by Horton and located in Greene County, Tennessee.

Plaintiffs allege a civil conspiracy in violation of the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and state law claims

for negligence and negligent entrustment.

This matter is before the Court on the motions for summary judgment filed by

all defendants, [Docs. 62, 65 and 67]. Plaintiffs have responded, [Doc. 88], and the

issues raised by the motions have been fully briefed. The parties have not requested

oral argument and the Court finds that oral argument is not essential to a fair

resolution of these motions. E.D.TN. LR 7.2. For the following reasons, the motions for summary judgment are GRANTED.

## I.      Subject Matter Jurisdiction

Plaintiffs invoke the subject matter jurisdiction of this Court pursuant to 18 U.S.C. § 1331 (federal question) because of plaintiffs' RICO claim. Absent the RICO claim, the Court lacks subject matter jurisdiction since diversity of citizenship does not exist[1] and plaintiffs assert no other basis for subject matter jurisdiction. Plaintiffs invoke the Court's supplemental jurisdiction over their state law claims pursuant to 18 U.S.C. § 1367.

## II.     Standard of Review

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge

---

[1]      The lead plaintiff, Donald Quade, is a citizen and resident of Greene County, Tennessee.

the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Id.* at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McClain v. Ontario, Ltd.*, 244 F.3d 797, 800 (6th Cir. 2000). This Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If this Court concludes that a fair-minded jury could not return a verdict in favor of the non-moving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The party opposing a Rule 56 motion may not simply rest on the mere allegations or denials contained in the party's pleadings. *Anderson*, 477 U.S. at 256.

Instead, an opposing party must affirmatively present competent evidence sufficient to establish a genuine issue of material fact necessitating the trial of that issue. *Id.* Merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Id.* A genuine issue for trial is not established by evidence that is "merely colorable," or by factual disputes that are irrelevant or unnecessary. *Id.* at 248-52.

## III.  Factual Background

The facts in this case are largely undisputed and the following statement of facts is taken primarily from plaintiff's filings in this case.

On the morning of September 14, 2006, Linda Quade was driving from her home in Greene County, Tennessee to her job at the Veterans Administration Medical Center in Johnson City, Tennessee. On the same morning, the defendant, Rodriguez driving in the opposite direction, crossed the center line of the roadway and struck Mrs. Quade's car head-on. As a result of the collision, which occurred on State Route 351 at its intersection with the 107 Cut-Off in Greene County, Mrs. Quade was killed and her vehicle severely damaged.

At the time of the accident, Rodriguez's blood alcohol level was .1209.[2]

---

[2]    Although Rodriguez's blood alcohol level was apparently lower than the .08 level made illegal under Tennessee law when he was blood tested some time after the accident, *see* T.C.A. § 55-10-401 ("It is unlawful for any person to drive or to be in physical control of an automobile or other motor driven vehicle on the public roads and highways of the state . . . while: . . . (2) The alcohol concentration

4

Rodriguez had a combination of cocaine, alcohol and Soma, a muscle relaxer, in his system. As a result, Rodriguez was intoxicated and his ability to operate a motor vehicle was impaired at the time of the accident. On May 18, 2007, Rodriguez pled guilty to vehicular homicide in the Greene County Criminal Court and was sentenced to a term of 8 years of imprisonment and is currently housed at the Northwest Correctional Complex in west Tennessee.

Rodriguez is, and was at all times relevant to this case, illegally in the United States. At the beginning of the summer of 2005, the defendant, Johnson hired Rodriguez to work on Johnson's farm in Greene County. Rodriguez had gone to Johnson's farm seeking work after Mexican acquaintances had suggested that he go there for work. Johnson owned a dairy and tobacco farm and leased land on which his son, Mike Johnson, raised squash. At the time Johnson hired Rodriguez, Rodriguez spoke little English and Johnson asked for no identification or background information from Rodriguez.

Rodriguez worked seven days a week for Johnson, seldom took any days off, and was paid $300.00 per week in cash by Johnson. Rodriguez worked more than 40 hours a week. Johnson kept no records documenting Rodriguez's employment or the payments made to him, provided Rodriguez no benefits and took no withholding from

in the persons blood or breath is eight–hundredths of one percent (.08%) or more"), the state's expert opined that the blood alcohol level at the time of the accident was .1209.

5

Rodriguez's earnings. During the year preceding the accident [3], Rodriguez worked for Johnson on the dairy farm and harvested tobacco and squash. His earnings from Johnson were Rodriguez's primary source of income. Although still employed by Johnson, Rodriguez had not worked on Johnson's farm on the day before the motor vehicle accident involving Mrs. Quade and it is undisputed that he was not acting within the course and scope of his employment at the time of the accident. Rodriguez's girlfriend, Yoana Herrera Ocampo ("Ocampo") also worked for Johnson harvesting squash prior to the birth of her son just before Christmas, 2005.

Johnson had previously hired four or five other individuals who spoke primarily Spanish and had likewise paid them in cash, keeping no records of their employment. Johnson also hired Mexican "contractors", paying them approximately $30,000.00 in cash to arrange workers for Johnson's farm. These workers used Johnson's tools, equipment and tractors. Johnson made no effort to verify the citizenship of these workers. Johnson generally located "contractors" at local stores where they went looking for work. Johnson also had other legal employees, to whom he paid higher wages than Rodriguez. For these employees, Johnson took out withholding, paid

---

[3]     Rodriguez testified that he worked for Johnson through September 12, 2006, but had not gone to work on the day prior to the accident because it was the end of the squash season. Johnson, on the other hand, testified that Rodriguez only worked for him as an  employee at his dairy  farm during 2005 and that he had told Rodriguez he would have to find other employment a few days before Christmas, 2005. For the purposes of deciding the pending motions, the Court will assume that Rodriguez's version is true.

additional benefits and maintained records.

At about the time Rodriguez and Ocampo began working for Johnson (early summer 2005), they rented a trailer from the defendant, Dunbar. According to Ocampo, she and Rodriguez were able to secure housing from Dunbar through Johnson's son, who was married to Dunbar's daughter. According to Rodriguez, he met Dunbar at a convenience store and asked if he knew of anyone renting places to live and Dunbar told him that he had a trailer for rent. Dunbar rented the trailer to Rodriguez and Ocampo for $80.00 per week, plus utilities. Dunbar never asked Rodriguez where he was from or where he worked and did not ask for any references. Dunbar testified that he asked Rodriguez for identification and was shown a Tennessee driver's license; Rodriguez, however, testified that he had never had a Tennessee driver's license.[4]

Dunbar went weekly to the trailer to collect the rent, which was paid by Rodriguez in cash. Rodriguez also reimbursed Dunbar for utilities with cash. Rodriguez was not given a receipt for any of his payments to Dunbar and Dunbar maintained no records reflecting to whom he rented any of his rental properties, including the trailer rented to Rodriguez, and kept no written records of rent paid. Dunbar apparently did not report his rental income on his income tax returns. Dunbar

---

[4]    Rodriguez had apparently been issued a Tennessee driver's license for identification purposes only, according to the accident report filed by the Tennessee Highway Patrol.

continued to rent the trailer to Ocampo after Rodriguez was jailed following the collision on September 14, 2006. Johnson and Dunbar knew each other because of the marriage of their children and Johnson knew Dunbar had rented the trailer to Rodriguez and Ocampo.

On February 28, 2006, more than six months before the subject automobile collision, Rodriguez purchased the 1998 Dodge pick-up he was driving at the time of the collision from Ken's Motors, a sole proprietorship owned by the defendant, Horton. Horton did not request of Rodriguez any form of identification before selling him the pick-up truck and did not ask for proof of insurance. Rodriguez did provide Horton with a letter showing his address. Although Rodriguez told Horton (or an employee of Horton) that he had no driver's license, he was nonetheless allowed to test drive the pick-up truck before he bought it. Rodriguez paid for the truck in cash partially earned on Johnson's farm.[5] The pick-up truck was registered in Rodriguez's name.

Horton was aware that illegal aliens resided in Greene County and he had no policy of declining to sell vehicles to illegal aliens. Horton acknowledged often selling vehicles to persons who spoke Spanish, like Rodriguez, and estimated that 90% of Mexicans pay for their vehicles in cash. Nothing in the record supports that

_____

[5] Plaintiffs acknowledge that some of the money used to pay for the truck was from "savings and some money from his girlfriend . . ." [Doc. 88, p. 2].

8

Horton was acquainted with either Johnson or Dunbar.

As noted above, Rodriguez had worked on Johnson's farm during the year prior to the accident and had worked during the week of September 14, 2006, harvesting squash on Johnson's farm. He had not, however, gone to work on September 13.[6] Rodriguez drank beer at home on the afternoon before the accident. The beer was purchased from Wal-Mart and/or Food Lion with money earned on Johnson's farm.

Prior to purchasing the 1998 Dodge pick-up truck from Ken's Motors, Rodriguez owned another truck purchased from somewhere else. Rodriguez was operating this previously owned truck on February 14, 2005, when he was involved in an accident in Hamblen County, Tennessee. As a result of the accident, he was arrested and charged with numerous traffic offenses. Rodriguez and Ocampo made a claim for property damage to the truck and personal injury to Ocampo arising out of the February 14 accident and were paid a settlement about 15 days before the 1998 Dodge was purchased from Ken's Motors. On August 23, 2005, Rodriguez was stopped for speeding by the Tennessee Highway Patrol and ticketed without being taken into custody.

---

[6] Plaintiffs originally claimed that Rodriguez was acting in the course of his employment at the time of the September 14 collision but no evidence in the record supports such a claim. Plaintiffs do suggest that the jury might not believe Rodriguez's statement that he had decided to quit working for Johnson before the collision and conclude that he was on the way to work for Johnson on the morning of the accident because he was "driving towards the field owned and leased by Johnson." Such speculation, however, does not create a genuine dispute about a material fact.

9

## IV.   The Racketeer Influenced and Corrupt Organizations Act

Although RICO was passed as part of a larger initiative, the Organized Crime Control Act of 1970, that specifically targeted organized crime and mob activity, *see United States v. Turkette*, 452 U.S. 576, 589 n.11 (1981), the Supreme Court has recognized that RICO reaches racketeering activity committed by legitimate businesses and organizations as well.  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498-99 (1985) ("RICO was an aggressive initiative to supplement old remedies and implement new methods for fighting crime . . . . [RICO can be] used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct").

Title 18 U.S.C. § 1964(c) creates a civil cause of action and treble damages for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter."  18 U.S.C. § 1962(c), provides that: "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  To state a RICO claim, then, under 18 U.S.C. § 1962(c), a plaintiff must show defendants  (1) conducted or participated in (2) the activities of an enterprise (3) through a pattern (4) of racketeering activity.  *Reves v. Ernst & Young*,

507 U.S. 170, 177 (1993). To prove a violation of 18 U.S.C. § 1962(d) (conspiracy to violate RICO), a plaintiff must prove (1) a conspiracy (2) with the purpose of violating 18 U.S.C. 1962(c). *See, e.g. Beck v. Prupis*, 529 U.S. 494, 506 (2000). As noted above, a plaintiff must also show an injury to business or property by reason of a violation of RICO. 18 U.S.C. § 1964(c).

"Conduct" refers to a defendant's conduct of or participation in the alleged enterprise's affairs. The words "conduct or participate" imply a degree of direction, and mean that the defendant must have "some part in directing the enterprise's affairs[.]" *Reves*, 507 U.S. at 179. This is commonly referred to as the "operation or management" test. *Id*.; *Stone v. Kirk*, 8 F.3d 1079, 1092 (6th Cir. 1993) ("[A]lthough 'RICO liability is not limited to those with primary responsibility for the enterprise's affairs' . . . one cannot be liable under section 1962(c) unless one has participated, in some degree, 'in the operation or management of the enterprise itself.'" (quoting *Reves*, 507 U.S. at 179)).

Section 1961(4) defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has defined an enterprise as a "group of persons associated together for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 583.

Proving the existence of a "legal entity" enterprise, such as a partnership or corporation, is relatively straightforward. Proving the existence of a "non-legal entity", "association in fact" enterprise, however, is more difficult. "An association in fact enterprise can be proven by showing 1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged." *VanDenBroeck v. CommonPoint Mortgage Co.*, 210 F.3d 696, 699 (6th Cir. 2000). These elements "require a certain amount of organizational structure which eliminates simple conspiracy from [RICO's] reach . . . . [T]he parties [must be] organized in a fashion that would enable them to function as a racketeering organization for other purposes . . . . All that is required is some minimal level of organizational structure between the entities involved." *Id.*

A "pattern of racketeering activity" is defined by statute as "[a]t least two acts of racketeering activity." 18 U.S.C. § 1961(5). "Racketeering activity" is further defined in 18 U.S.C. § 1961(1) as any one of a numerous list of state and federal offenses that qualify as racketeering activity. Among the predicate acts listed in 18 U.S.C. § 1961(1) are violations of the Immigration and Nationality Act, section 274 (codified at 8 U.S.C. § 1324). A pattern of racketeering activity "is proved by evidence of the requisite number of acts of racketeering committed by the participants

in the enterprise." *Turkette*, 452 U.S. at 583.

## V.    <u>The Pending Motions</u>

Defendants generally assert in their motions that this Court lacks subject matter jurisdiction because there is no federal question in that plaintiffs may not maintain their present action under the RICO statute.  More specifically, the defendants allege that plaintiffs cannot establish a pattern of racketeering activity but that, at most, plaintiffs simply show "separate action by separate defendants."  Defendants further allege that plaintiffs cannot show a violation of 8 U.S.C. § 1324 and therefore cannot establish violation of any of the numerous list of state and federal offenses that qualifies as racketeering activity, that there is no proof of any agreement or conspiracy among the defendants,  and that plaintiffs have not shown a RICO injury, *i.e.*, injury to business or property as required by 18 U.S.C. § 1964(c).    The defendants also assert that plaintiffs cannot show that defendants proximately caused any damages which resulted from the automobile collision on September 14, 2006.        While it may be that plaintiffs can establish a RICO injury, it is doubtful that plaintiffs can show a violation of 8 U.S.C. § 1324 or that they can show any conspiracy among the defendants to violate RICO.  It is not necessary, however,  for the Court to decide these issues and they will be pretermitted.  Because plaintiffs cannot show that any of their alleged damages were proximately caused by the defendants' alleged violation,

and this failure is fatal to their claims under RICO, this Court concludes that the plaintiffs lack RICO standing to bring this action against these Tennessee defendants and this Court therefore lacks subject matter jurisdiction of this complaint because there is no federal question.

### **Analysis and Discussion**

RICO's statutory standing provision, 18 U.S.C. § 1964(c) provides, as noted above, a private cause of action under RICO for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). In *Holmes v. Securities Investor Protection Corp.*, the United States Supreme Court held that evidence that an injury to plaintiff would not have occurred "but for" the defendant's alleged RICO violation, *i.e.*, that plaintiff suffered a mere "injury in fact," is insufficient to establish RICO causation. Instead, the plaintiff must also prove "proximate causation." 503 U.S. 258, 265-70 (1992). "Proximate cause" requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268. Following *Holmes*, the Sixth Circuit held that a RICO civil plaintiff must prove that it realized damages directly caused by the defendant's conduct violative of RICO; mere "but for" injuries consequent to intervening losses directly caused to another party are insufficient. *See Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir. 1992).

14

Common law principles of proximate causation are incorporated into the RICO statute. *Holmes*, 503 U.S. at 267-68; *Perry v. The American Tobacco Company, Inc.*, 324 F.3d 845 (6th Cir. 2003). The Sixth Circuit recently described the requirement as follows:

> . . . RICO not only imposes a statutory standing limitation on claimants who seek recovery for derivative or indirect injuries, but it also incorporates other traditional proximate-cause limitations on claimants. *See Perry*, 324 F.3d at 850 ("Though foreseeability is an element of the proximate cause analysis, it is distinct from the requirement of direct injury."); *Desiano*, 326 F.3d at 348 (noting that RICO incorporates a directness requirement that is more stringent than most states require and that RICO also incorporates foreeseeability"). Accordingly, while a RICO plaintiff and defendant may have a *direct* and not a *derivative* relationship, the causal link between the injury and the conduct may still be too weak to constitute proximate cause-because it is insubstantial, unforeseeable, speculative, or illogical, or because of intervening causes. *See Perry*, 324 F.3d at 850; *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989) (RICO plaintiffs must "set out a reasonable and principled to basis of recovery" that is "not based on mere speculation and surmise").

> The point of all this is not just that the distinction between statutory standing and proximate cause exists, but that unbundling these distinct concepts has practical significance for RICO cases in general and for this case in particular. From a substantive standpoint, a RICO plaintiff who can show a direct injury may still lose the case if the injury does not satisfy other traditional requirements of proximate cause-that the wrongful conduct be a substantial and foreseeable cause and that the connection be logical and not speculative.

15

*Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 614-15 (6th Cir. 2004) (emphasis in original). The Supreme Court has, subsequent to *Holmes*, described the "by reason of" language of the RICO statute "as meaning, in all civil RICO cases, that the violation must be both the cause-in-fact and the proximate cause of the plaintiff's injury." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 477 (2006). (Thomas, J., concerning in part and dissenting in part).

Thus, a successful RICO claimant must show that his injury would not have occurred "but for" the conduct of the defendants **and** that his injuries were "proximately caused" by the defendant's alleged RICO violation. The Supreme Court has referred to "proximate cause" as "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts" reflecting "ideas of what justice demands, or of what is administratively possible and convenient." *Holmes,* 503 U.S. at 268 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser & Keeton, Law of Torts, § 41, p. 264 (5th ed. 1984)). The generally established common law principle of proximate cause requires that the defendant's conduct "played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission." *See* O'Malley, Grenig & Lee, Federal Jury Practice and Instructions, 5th ed., § 120.60 (2000). Thus, "[w]hen a court

evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza*, 547 U.S. at 461. *See also Saro v. Brown*, 11 Fed. Appx. 387, 389 (6th Cir. 2001) (noting that even whan a court assumes, arguendo, that the plaintiff has suffered a compensable injury under RICO, the plaintiff must still show proximate cause , *i.e.* show some injury that flows from one or more of the predicate acts of the defendant) ("If no injury flowed from a particular predicate act, no recovery lies for the commission of that act.")

Under Tennessee law, which reflects the same principle, an injured party must, to establish proximate cause, show that (1) the actor's conduct was a substantial factor in bringing about the harm complained of,  (2) there is a policy which should relieve the wrongdoer from liability because of the manner in which the negligence had resulted in harm, and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence. *Kellner v. Budget Car & Truck Rental, Inc.*, 359 F.3d 399, 406 (6th Cir. 204).  "[T]he less direct an  injury is, the more difficult it becomes to ascertain the amount of plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269 (citing *Associated General Contractors of Cal., Inc. v. Carpenters 723*, 459 U.S. 519, 542-43 (1983)).

Two cases, both applying Tennessee law and both arising in this district, illustrate the application of these principles. In *Halvorsen v. Plato Learning, Inc*., 167 Fed. Appx. 524, 2006 WL 348163 (6th Cir. 2006), plaintiff's decedent was fired from his employment with the defendant. After Halvorsen's discharge, he became "despondent." Three weeks after the firing, Halvorsen, who was "nervous, appeared depressed, and worried about his financial situation with his children," left his house to get cigarettes. He then died in a single-car accident. In pressing her wrongful death claim, plaintiff contended that if her husband "hadn't been terminated in the way he was terminated, he wouldn't have been despondent . . . nervous . . . worried" and would have been in Las Vegas on a business trip for his former employer at the time of his death. *Id*. at 530.

The Sixth Circuit found that the claim failed applying fundamental tort law principles and held that, even if the defendant's decision to fire Halvorsen could be said to be one of many "but for causes of his death, the decision could not 'plausibly be described *as the proximate* cause of his death.'" *Id*. at 531 (emphasis in original). Noting that "a person in Mr. Halvorsen's emotional state could well be expected to suffer an accident of the kind that killed him," the Sixth Circuit held that that "is no answer to this defect in the claim, because [plaintiff] nowhere alleges that [defendant] knew or should have known of [Halvorsen's] emotional state, . . ." *Id*.

18

In *Kellner*, the operator of a tractor-trailer rig experienced mechanical problems and drove his rig completely into the emergency lane of the interstate. The operator of the rig was underneath the tractor-trailer when another driver, whose grandsons were passengers in her truck, left the far right travel lane of traffic, moved into the emergency lane, and collided with the parked tractor-trailer. As a result of the collision, the tractor-trailer driver, the driver of the truck and one of her grandsons were killed. The Kellners, the next of kin of the killed driver and her grandson, sued, contending that defendants' negligence "proximately caused the accident by leaving a tractor-trailer parked in the emergency 'breakdown' lane along the shoulder of the interstate."

The Sixth Circuit affirmed a grant of summary judgment to the defendants, finding that, even if it was negligent for the operator of the tractor-trailer to park his rig in the emergency lane, defendant's actions were not the proximate cause of the plaintiffs' injuries. The Sixth Circuit agreed with the district court that the truck driver's actions in leaving the travel lanes and crashing into the parked tractor-trailer rig were the proximate cause of plaintiffs' losses. *Kellner*, 359 F.3d at 406. The appellants had argued that the district court erred because it was foreseeable when the tractor-trailer rig was parked in the emergency lane that another vehicle might leave its proper lane of travel and collide with the parked rig. The Sixth Circuit rejected that

reasoning because, as the Sixth Circuit saw it, to do so would lead to "logical absurdities," noting that to adopt the appellant's position could lead to the absurd result that "a driver legally traveling in her own lane, who is hit by another vehicle that crossed into that driver's lane, could be held liable for negligence because it was foreseeable that vehicles leave their lanes of traffic." *Id.* at 407 ( quoting *Underwood v. Water Slides of Mid-America*, 823 S.W.2d 171, 180 (Tenn. Ct. App. 1991)). The court noted that a person is not required "to anticipate or foresee what would normally happen; one is not required to anticipate and provide against what is unusual or unlikely to happen, or that which is only remotely possible." *Id.*

Plaintiffs in the instant case argue that "Johnson, Dunbar and Horton provided defendant Rodriguez with a job, a home, and a vehicle; by providing the means for defendant Rodriguez to remain in Greene County and drive on Greene County's roads, the defendants proximately caused damage to Linda Quade's Honda Accord." [Doc. 88, p. 42]. Even assuming that providing Rodriguez with a home, a job and a vehicle to drive under the circumstances set forth in this case constitute acts in furtherance of a RICO conspiracy, and even further assuming that these acts could be said to be one of many "but for" causes of the September 14 collision,[7] it cannot be said that these

---

[7] Plaintiffs allege in their response in opposition to the motions for summary judgment that "but for the conduct of Defendants Johnson, Dunbar and Horton, Defendant Rodriguez would not have had the mechanism, means or ability to have been living and driving in Greene County on September 14, 2006." [Doc. 88, pp. 3-4]. To suggest that the actions of Johnson, Dunbar and Horton were the sole cause in fact of the September 14 accident is a dubious contention. For purposes of deciding the pending

acts proximately caused the collision and resulting injury.

There is no direct link between the alleged RICO violations and the injury alleged in this case and it certainly cannot be said that the actions of these defendants were a substantial factor in bringing about the complained of harm. Nor can plaintiffs' reasonably argue that Rodriguez's actions on the date prior to and on the date of the accident in question could have been reasonably foreseen or anticipated by a person of ordinary intelligence.[8]

Plaintiffs' argument that the knowledge of some or all of these defendants of Rodriguez's status as an illegal alien and his status as an unlicensed driver somehow contributed, in a substantial way, to the accident on September 14, 2006, is almost baffling, as is their argument that the accident on September 14 would not have happened if Johnson hadn't given Rodriguez a job, Dunbar had not rented him a place to live and Horton had not sold him a vehicle. Carrying plaintiffs' arguments to their logical conclusion leads, even more so than in *Kellner*, to illogical absurdities.

_____

motions, the Court will accept that the actions of defendants were a contributing "but for" cause.

[8]     Plaintiffs made the conclusory allegation that "[i]f an individual is willing to ignore federal immigration laws and willing to drive without a driver's license, it is certainly foreseeable that the individual would be willing to drink and drive." [Doc. 88, pp. 46-47]. As set forth above, a defendant is required to foresee and anticipate what would normally happen, not what is remotely possible. Except for arguing that illegal entry into the country and driving without a driver's license establishes propensity to drive and drink, plaintiffs make no real effort to show a connection between the two. They do suggest a statistical correlation between unlicensed drivers and fatal accidents; they cite no case law, however, that shows that such evidence would be admissible, or sufficient, to establish that Rodriguez's unlicensed status caused any injury to plaintiffs in this case.

First of all, it is an absurdity to suggest that, except for the actions of Johnson, Dunbar and Horton, Rodriguez would not have been able to remain illegally in this country and thus the September 14 accident would never have occurred. It is also illogically absurd to suggest that an employer who employs an illegal alien can reasonably be expected to foresee that the illegal alien will become intoxicated, drive an automobile and be involved in an automobile accident, as is the suggestion that a person who rents a house to an illegal alien could be expected to foresee or anticipate such an occurrence. Plaintiffs' argument with respect to the sale of the automobile by Horton fares no better. The seller of an automobile, even one selling to a person he knows to be a non-citizen and without a driver's license, cannot reasonably be expected to foresee or to anticipate that the driver of that automobile will become intoxicated and injure someone else. Even if it could be reasonably assumed that a person like Rodriguez, illegally in the country and without a driver's license, could be expected to become intoxicated and cause an accident, that does not cure the lack of proximate cause in this case because plaintiffs have not shown, or even alleged, that the defendants knew or should have known that Rodriguez would drink, use drugs, and drive an automobile.

The incongruity of the plaintiffs' position is further illustrated by considering how plaintiffs' theory might apply to others not sued in this case. Can it be said that

those who provide jobs, shelter and automobiles to illegal aliens are guilty of harboring aliens pursuant to 18 U.S.C. § 1324 any more so than is the grocery store which supplies food, the medical care providers and pharmacies which provide healthcare, the department stores which supply clothing, the utility companies which supply water and electricity, the Wal-Mart or Food Lion which sells beer, the law enforcement officers who fail to arrest, the convenience store which sells gasoline or the local state and federal governments which educate their children?  The plaintiffs argue strenuously that these defendants knew about or were deliberately indifferent to  Rodriguez's illegal alien status yet they never suggest how that, even if true, has some connection to his driving while intoxicated and causing the collision that killed Linda Quade.  While it is easy for one to be sympathetic with the position of  these plaintiffs whose loved one was killed by the senseless criminal act of Rodriguez, who was illegally in this country, that in no way changes the fact that these defendants committed no acts, RICO violations or otherwise, which can reasonably be characterized as having proximately caused the September 14 collision.

One last issue raised by the plaintiffs should be addressed.  Plaintiffs argue that it would be improper for this Court to resolve plaintiffs' claim of proximate cause at the summary judgment stage of this litigation, because proximate cause is a question for the trier of fact, "unless the uncontroverted facts and inferences to be drawn from

them make it so clear that all reasonable persons must agree on the proper outcome."
[Doc. 88, p. 43]. While plaintiff's position is a correct statement of the law, it does
not provide a safe harbor for the plaintiffs in this case. As set forth above, the
plaintiffs do not establish that there are material facts in dispute in this case because,
as a matter of law, the conduct of the defendants, even accepting plaintiffs' allegations
as true, do not establish that the conduct of the defendants caused the plaintiffs'
injuries. In addition, the Sixth Circuit has suggested that RICO civil cases where there
is "a weak or insubstantial causal link, and lack of foreseeability, or a speculative or
illogical theory of damages," are better suited for resolution with a summary judgment
motion than a motion to dismiss under Rule 12(b)(6). *Trollinger*, 370 F.3d 615 (citing
*N.O.W. v. Scheidler*, 510 U.S. 249 (1994)). Indeed, it would be a waste of judicial
resources to allow a case where there is no material fact in dispute to go forward to
trial.[9]

## V.    Conclusion

Because the plaintiffs' have failed to show standing and proximate cause in
regard to their RICO action, it is hereby **ORDERED** that the motions for summary
judgment filed by the defendants Ken Horton, Ken's Motors, Robert Dunbar, and

---

[9]    Although this case could have been resolved on Rule 12(b)(6) motions, this Court denied
these defendants' earlier motions to dismiss, finding the matter more appropriately addressed in the
context of the summary judgment motions.

Maynard Johnson are **GRANTED** and Count 1 of the plaintiffs' second amended complaint is hereby **DISMISSED WITH PREJUDICE**. [Docs. 62, 65 and 67]. Furthermore, given that this Court lacks subject matter jurisdiction of this complaint because there is no federal question, this Court declines to exercise supplemental jurisdiction over the plaintiffs' state law claims for negligence and/ or recklessness, and negligent entrustment.[10] The plaintiffs' state law claims are, therefore, **DISMISSED WITHOUT PREJUDICE**.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

---

[10] There is also a suit pending in the Tennessee state courts with respect to the state law claims made by the plaintiffs in this case. That case, *Quade, et al v. Rodriguez, et al*, #07CV626, was filed by the same plaintiffs against the same defendants and alleges civil conspiracy, negligence and/or recklessness, aiding and abetting tortious conduct and negligent entrustment. These state law causes of action are more suitable for resolution in state court.